UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TONYA POWELL-LEE,

        Plaintiff,

v.                                                                Case No. 05-70318
                                                                  Honorable Patrick J. Duggan

HCR MANOR CARE, HEALTH CARE
RETIREMENT CORP. OF AMERICA
d/b/a HEARTLAND HEALTH CARE
CENTER-PLYMOUTH COURT and
DARRYL ADAMS,

        Defendants.
_____/

**OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on December 22, 2005.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
              U.S. DISTRICT COURT JUDGE

Plaintiff Tonya Powell-Lee ("plaintiff") filed this lawsuit in state court against

defendants alleging violations of Michigan's Elliott-Larsen Civil Rights Act and

Whistleblowers' Protection Act, as well as a claim alleging intentional infliction of

emotional distress.  Defendants HCR Manor Care and Health Care and Retirement

Corporation of America (collectively "defendant")[1] removed plaintiff's amended

_____

[1]It is not clear from any pleading what the relationship is between HCR Manor
Care and Health Care and Retirement Corporation of America.  The record also does not

1

complaint to federal court pursuant to 28 U.S.C. § 1332 after plaintiff failed to serve

Darryl Adams, the only non-diverse defendant.  Presently before the Court is defendant's

motion for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil

Procedure, filed October 14, 2005.  Plaintiff filed a response to defendant's motion on

November 4, 2005, in which she requests permission to amend her complaint to add a

count of negligent supervision, retention, and training *if* the Court is inclined to grant any

part of defendant's motion. The Court held a hearing on defendant's motion for summary

judgment on December 15, 2005.

## I.      Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law.  *See* FED. R.

CIV. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52,

106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule

56(c) mandates summary judgment against a party who fails to establish the existence of

an element essential to that party's case and on which that party bears the burden of proof

at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of

indicate which defendant employed plaintiff.

2

material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## II.    Factual Background

Health Care and Retirement Corporation of America conducts business as the Heartland Health Care Center-Plymouth Court ("Plymouth Court") in Plymouth, Michigan. Plaintiff began working at Plymouth Court as a nursing assistant on December 2, 1991. In 1996, plaintiff transferred to a position in Central Supply; she transferred to the Medical Records Department in 1997.

On November 28, 2001, plaintiff wrote a memorandum to Plymouth Court's "Administration," specifically Amy LeFleur, complaining about the conduct of a co-employee, Darryl Adams ("Adams"). *See* Mot. Ex. F. Adams worked at Plymouth Court as a housekeeping aid and was a union employee. According to plaintiff's memorandum, she agreed to drive Adams and another co-worker to a co-worker's birthday party after

3

work on October 5, 2001. *See id.* Plaintiff claims Adams called her about a week later at work and told her that he is attracted to her. *See id.* Plaintiff states that she thanked Adams for the compliment and then explained that she is married and not interested. *See id.*

According to plaintiff's memorandum, on another date about a week and a half after Adams called plaintiff at work, plaintiff began to feel that Adams was following her around Plymouth Court. *See id.* Plaintiff writes that Adams apologized to her later that day and told her he "was admiring [her] from different angles." *See id.* Plaintiff told Adams not to call or follow her. *See id.* Plaintiff writes that she believed Adams "took [her] serious[ly]" because he apologized and walked away. *See id.* According to plaintiff, she saw Adams the next day without incident. *See id.*

The next incident between plaintiff and Adams described in plaintiff's memorandum occurred on November 21. According to plaintiff, Adams came to her office that morning asking for cereal. *See id.* Plaintiff states that when Adams asked for a cup for the cereal and plaintiff said she did not have one, he became angry, started yelling at her, and calling her names. *See id.* Plaintiff writes that "[t]his is the point I decided to go tell someone I really need help I am not able to handle this alone." *See id.* She further writes, "I was just so frustrated with the filling [sic] of humiliation, I was physically sick with the thought of coming back here." *See id.*

After receiving plaintiff's memorandum, defendant suspended Adams and conducted an investigation. *See* Mot. Ex. G. Based on its investigation, defendant found

4

no evidence of sexual harassment. *See id*. Ex. H. Nevertheless, defendant instructed Adams to stay on floor "C"– his assigned work floor– since plaintiff's office was on floor "A", to alert his supervisor if he needs to leave the area, and to let his supervisor know if plaintiff is in his work area so the supervisor could oversee the situation or temporarily assign Adams to another area. *See id*. Ex. I. Defendant also conducted an in-service on sexual harassment in February 2002, which Adams attended. *See id*. Ex. J. Plaintiff wrote a note to Amy LeFleur on December 10, 2001, thanking her for listening to her and initiating an investigation.

Plaintiff indicates in her response that her November 28 memorandum was not the first time she complained to a supervisor about Adams' conduct. According to plaintiff, she verbally complained to the Director of Nursing, Ruth Proffer, immediately after the cereal incident on November 21. Plaintiff asserts that Proffer's only response was to tell plaintiff that she "dress[es] borderline sexy." *See* Resp. Ex. 7.

Plaintiff claimed at her deposition in this case that she verbally complained to LeFleur regarding other conduct by Adams. Specifically, plaintiff testified that on January 4, 2002, around the second week of February 2002, and again in the first part of May 2002, she caught Adams staring at her. *See* Resp. Ex. 2 at 116-22. Plaintiff claims that in May 2002, while she was bending over filing some paperwork, Adams walked by and told her he "liked that position." *See id*. at 121. Plaintiff claims that LeFleur told her there was nothing LeFleur could do if no one else witnessed Adams' behavior.

In early July 2002, Adams' union representative, Judy Jackson, approached

5

plaintiff and asked if plaintiff would object to Adams being assigned to clean plaintiff's floor due to a staff shortage in the housekeeping department. *See* Mot. Ex. L. Plaintiff responded that she had not experienced any problems with Adams "in a couple of months" and therefore would "have no problem with him returning to [A] floor periodically . . ." *See id.*

Plaintiff does not present any evidence to suggest that Adams acted inappropriately towards her from May 2002 through February 2004, or that she reported conduct by Adams to her supervisors during this period.[2] Plaintiff alleges, however, that other Plymouth Court employees reported sexual harassment by Adams during this period and that Adams was suspended on three occasions in late 2003 to early 2004 "for stalking like behavior toward women." *See* Resp. at 6-7. In fact, in January 2004, a female employee reported that Adams "always stares and looks at [her] butt" and was "worried about him following [her home] after work." *See* Resp. Ex. 20. Defendant, however, suspended Adams in response to this report and conducted an investigation. Notably

---

[2]As evidence of Adams' improper conduct towards her in late 2003, plaintiff claims in her response that a co-worker, Aimee Bird, witnessed Adams stalking plaintiff and reported this to LeFleur on November 30, 2003. *See* Resp. at 6 ¶ 28 (citing Ex. 21). Bird's note to LeFleur, however, is dated November *2001*, and in it Bird relates incidents that occurred in October 2001 (i.e. Adams' comments to plaintiff after the co-worker's birthday party). *See* Resp. Ex. 21. Plaintiff also refers to a letter she sent defendant on March 16, 2004, as evidence that she informed defendant at this time that she was concerned about her safety in the workplace as a result of Adams' behavior towards her. *See id.* at 7 ¶ 38 (citing Ex. 13). Plaintiff's March 16 letter does not refer to Adams, rather it refers to an incident between plaintiff and her supervisor, Karen Fairchild, that is unrelated to the pending lawsuit. *See id.* Ex. 13.

there is no evidence in the record as to whether defendant found support for the employee's accusations. The remaining instances where defendant suspended Adams did not involve conduct by Adams towards female employees; rather Adams was disciplined for leaving his assigned work area and for going through some desk drawers in the activities department. *See* Resp. Ex. 27, 29, 30-31.

Nevertheless plaintiff claims that she was concerned for her safety in the workplace in late 2003 and early 2004 due to Adams' previous behavior, and as evidence she cites a letter she wrote on March 16, 2004. *See* Resp. at 7 (citing Ex. 13). Plaintiff, however, does not discuss Adams in her March 16 letter. Instead, plaintiff refers to a recent incident between herself and her supervisor, Karen Fairchild. *See id*. Ex. 13.

On March 12, 2004, Fairchild summoned plaintiff to her office in order to conduct an in-service regarding plaintiff's use of "speedy notes" to communicate with her supervisors. *See* Mot. Ex. N. When Fairchild asked plaintiff to sign a form reflecting Fairchild's completion of the in-service, plaintiff refused to sign. *See id*. According to Fairchild, plaintiff then said she was "tired of being harassed," began backing out of Fairchild's office into the resident hallway, and "became very loud." *See id*. Fairchild claims that she asked plaintiff to lower her voice but plaintiff, who now was standing in the hallway, refused to stop yelling. *See id*. Fairchild relates that she then touched plaintiff's shoulder and again asked her to stop. *See id*. Eventually Fairchild told plaintiff she needed to clock out and leave the facility. *See id*. After doing so, plaintiff went to a nearby police station and filed a police report complaining that Fairchild

physically assaulted her.  *See id*.  On March 17, 2004, Fairchild counseled plaintiff regarding her behavior on March 12.  *See id*.  According to an "Employee Warning Notice" signed by plaintiff and Fairchild on March 17, Fairchild cited plaintiff for arguing with a supervisor in a resident area and making false accusations of harassment.  *See id*.

On March 24, 2004, plaintiff was working at her desk when Adams entered her office and began changing the plastic bag in a wastebasket behind her.[3]  According to plaintiff, when she turned around, Adams' penis was exposed and he appeared to be masturbating.  Plaintiff immediately fled the room and reported the incident.  While plaintiff waited for her supervisors, she telephoned the police to report the incident.  At her deposition in this case, plaintiff claimed that Jennifer Pressman, the Administrator of Plymouth Court, came into the office where plaintiff was waiting and told plaintiff that she was unhappy plaintiff had called the police and that "there will be some disciplinary action, not leading to [sic] or excluding termination, if there was any discussion of the alleged situation."  *See* Resp. Ex. 2 at 138 & 159.  Pressman denies telling plaintiff that she could or would be disciplined for contacting the police.  *See* Mot. Ex. D ¶ 8.

On the same day as the incident, defendant suspended Adams and began investigating plaintiff's report.  *See* Mot. Ex. P.  The following day, defendant sent a termination letter to Adams.  *See id*.  In the letter, Adam's supervisor states that "[a]fter a complete investigation into the incident with a fellow employee on the morning of March

---

[3]Plaintiff shared her office with other co-workers, although they were not in the office at the time.

24, 2004, we have concluded that your actions and conduct were of an inappropriate

sexual nature.  This behavior is considered severe and cannot be tolerated in the work

environment."  *See id.*

At 5:00 a.m. on March 25, plaintiff telephoned Plymouth Court and told Kathleen

Miller, a nurse who answered the phone, that she "would not be back until further notice."

*See* Mot. Ex. Q.  According to Miller, she asked plaintiff what she meant and plaintiff

said "she would not be in anymore."  *See id*.  On the staffing log for that date, Miller

indicated that plaintiff had resigned.  *See id.*

At some time on March 25, defendant received a letter via facsimile from Dan

O'Neill, a staff clinician at the Oakland Psychological Clinic, indicating that plaintiff had

been seen the previous day and that he recommended that she "not return to work this

week."  *See id.* Ex. R.  O'Neill indicated that plaintiff would be seen again on March 29,

and that "a determination will be made then about a return to work date."  *See id.*

Defendant tried to reach plaintiff at her home on several occasions after receiving

her March 25 telephone call and O'Neill's letter.  *See* Ex. O at 150; Resp. Ex. 35.

Plaintiff, however, ignored defendant's calls.  *See id*.  On April 1, 2004, defendant sent

plaintiff a letter reflecting her termination.  *See* Mot. Ex. S.  In the letter, defendant

advises plaintiff that "[d]ue to the following circumstances, your termination became

necessary:"

> • Your phone call to Heartland Health Care Center - Plymouth
> on the morning of March 25, 2004 stating that you resigned
> your position.

> • Failure to contact the facility or to provide documentation
> from your physician regarding the results of your follow up
> visit on March 29, 2004.
>
> • Failure to report to work or contact your supervisor on
> March 30, 31, and April 1, 2004, which can only be viewed as
> no call/no shows.

*See* Ex. S. On the same date that it sent plaintiff this letter, defendant received a second

letter from O'Neill at the Oakland Psychological Clinic via facsimile, indicating that

plaintiff still was not able to return to work. *See* Resp. Ex. 18.

**III.    Applicable Law and Analysis**

Michigan's Elliott-Larsen Civil Rights Act ("Elliott-Larsen" or the "Act")

prohibits discrimination on the basis of sex in the workplace.  MICH. COMP. LAWS ANN.

§§ 37.2101-37.2803.  Discrimination because of sex includes sexual harassment.  MICH.

COMP. LAWS ANN. § 37.2103(i).  The Act defines "sexual harassment" to include:

> unwelcome sexual advances, requests for sexual favors, and
> other verbal or physical conduct or communication of a
> sexual nature under the following conditions:
>
> (*i*) Submission to the conduct or communication is made a
> term or condition either explicitly or implicitly to obtain
> employment ...
>
> (*ii*) Submission to or rejection of the conduct or
> communication by an individual is used as a factor in
> decisions affecting the individual's employment ...
>
> (*iii*) The conduct or communication has the purpose or effect
> of substantially interfering with an individual's employment
> ... or creating an intimidating, hostile, or offensive
> employment ... environment.

MICH. COMP. LAWS ANN. § 37.2103(i).  Sexual harassment falling into the first and second subsections is commonly labeled "quid pro quo harassment."  *Chambers v. Trettco, Inc.*, 463 Mich. 297, 310, 614 N.W.2d 910, 915 (2000)(citing *Champion v. Nationwide Sec., Inc.*, 450 Mich. 702, 708, 545 N.W.2d 596 (1996)).  "Sexual harassment that falls into the third subsection is commonly labeled 'hostile environment harassment.'"  *Id.* (citing *Radtke v. Everett*, 442 Mich. 368, 381, 501 N.W.2d 155 (1993)).

Plaintiff alleges that defendant is liable for both categories of sexual harassment.  In Count II of her first amended complaint she alleges quid pro quo sexual harassment.  In Count III she claims she was subjected to a hostile work environment.  Plaintiff also alleges in Count I that defendant discriminated against her "by subjecting her to humiliation and discrimination to which other workers were not subjected, all because of her sex."  *See* Compl. ¶ 16.  This claim is indistinguishable from her hostile work environment claim.[4]

---

[4]When asked to explain the difference between Plaintiff's sex discrimination claim and sexual harassment claim at the motion's hearing, Plaintiff's counsel stated that two female employees suffered adverse actions because of complaints regarding sexual harassment and "there is no evidence in the record that men were treated in that fashion." Defendant's counsel responded that Plaintiff did not allege disparate treatment in her complaint and that Plaintiff has not sought any discovery with respect to such a claim. Defendant's counsel further stated that she did not specifically address Plaintiff's "sex discrimination" claim in the motion for summary judgment because she viewed the claim, like the Court, as indistinguishable from Plaintiff's sexual harassment claim.  Plaintiff cannot simply amend her sex discrimination claim by stating that claim differently in response to Defendant's motion for summary judgment.  *See Tucker v. Union of Needletrades, Indus., and Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005)(citing *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).  As the *Gilmour* court stated, "[a] plaintiff may not amend her complaint through argument in a

Elliott-Larsen also provides that an employer shall not "retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." MICH. COMP. LAWS ANN. § 37.2701(a). Similarly, Michigan's Whistleblowers' Protection Act ("Whistleblowers' Act") makes it unlawful to "discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee . . . reports or is about to report . . . a violation or a suspected violation of a law or regulation . . . unless the employee knows that the report is false . . ." MICH. COMP. LAWS ANN. 15.362. Plaintiff alleges retaliation in violation of Elliott-Larsen in Count IV of her first amended complaint; she alleges violation of the Whistleblowers' Act in Count V.

### A.    Quid Pro Quo Sexual Harassment

To establish a claim of quid pro quo harassment, a plaintiff must demonstrate the following:

> (1) that she was subject to any of the types of unwelcome conduct or communication described in the statute, and (2) that her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment.

*Chambers*, 463 Mich. at 310, 614 N.W.2d at 915 (citing *Champion*, 450 Mich. at 708-09,

brief opposing summary judgment." 382 F.3d at 1315.

545 N.W.2d 596).  As the Michigan Supreme Court has described, "quid pro quo

harassment occurs only where an individual is in a position to offer tangible job benefits

in exchange for sexual favors or, alternatively, threaten job injury for failure to submit."

*Champion*, 450 Mich. at 713, 545 N.W.2d 596. Because "the quid pro quo harasser, by

definition, uses the power of the employer to alter the terms and conditions of

employment," the Michigan Supreme Court has held that an employer is strictly liable for

quid pro quo harassment.  *Chambers*, 463 Mich. at 311-13, 614 N.W.2d at 915-16.

Plaintiff cannot establish quid pro quo harassment because neither Adams nor

anyone else at Plymouth Court used plaintiff's submission to or rejection of Adams'

unwelcome sexual conduct or communication as a factor in decisions affecting her

employment.  Adams was not in a position to offer plaintiff tangible job benefits in

exchange for sexual favors or to threaten plaintiff's job for failure to submit.  He was a

housekeeping aid with absolutely no supervisory authority over plaintiff or anyone else at

Plymouth Court.  *See* Mot. Ex. D ¶ 2.  The Court therefore concludes that defendant is

entitled to summary judgment with respect to plaintiff's quid pro quo sexual harassment

claim.

**B.     Hostile Work Environment**

In order to establish a claim of hostile environment harassment, a plaintiff must

prove the following elements:

> (1) the employee belonged to a protected group;
> (2) the employee was subjected to communication or conduct
> on the basis of sex;

13

(3) the employee was subjected to unwelcome sexual conduct or communication;
(4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and
(5) respondeat superior.

*Radtke*, 442 Mich. at 382-83, 501 N.W.2d at 162.  As to the fifth element, "the violation can only be attributed to the employer if the employer failed to take prompt and adequate remedial action after having been reasonably put on notice of the harassment." *Chambers*, 463 Mich. at 313, 614 N.W.2d at 916.  In other words, unlike quid pro quo sexual harassment, an employer is not strictly liable when an employee's unwelcome sexual conduct or communication creates a hostile work environment.  *Id*. at 311-12, 614 N.W.2d at 915-16.

With respect to the fourth element, an objective reasonableness standard is utilized to assess whether a hostile work environment was created.  *Id*. at 386, 501 N.W.2d at 164. Pursuant to this standard, the relevant question is "whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment."  *Id*. at 394, 501 N.W.2d at 167.  Among the factors to be considered are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 367 (1993).

14

"It is only when the workplace is 'permeated' with discriminatory intimidation and insult that the Civil Rights laws are implicated." *Schemansky v. California Pizza Kitchen, Inc.*, 122 F. Supp. 2d 761, 777 (E.D. Mich. 2000)(citing *Harris*, 510 U.S. at 21, 114 S. Ct. at 370). "The work environment as a whole must be considered rather than a focus on individual acts of alleged hostility." *Id*. "Although rare, single incidents *may* create a hostile environment– rape and violent sexual assault are two possible scenarios." *Radtke*, 442 Mich. at 394-95, 501 N.W.2d at 168 (emphasis in original).

Putting aside the incident on March 24, 2004, at most plaintiff identifies a handful of occasions over a seven month period where Adams stared at her, followed her, and commented that he was attracted to her and liked watching her in a particular position. Prior Sixth Circuit decisions indicate that this conduct is not sufficiently severe or pervasive to constitute sexual harassment. *See, e.g., Clark v. United Parcel Service Inc.*, 400 F.3d 341, 351 (6th Cir. 2005)(agreeing with district court that three relatively isolated incidents over a period of approximately two and a half years did not support a legal claim of a hostile work environment where the plaintiff's supervisor told the plaintiff vulgar jokes, twice placed his vibrating pager on her thigh, and pulled at her overalls after she told him she was wearing a thong); *Mast v. IMCO Recycling of Ohio, Inc.*, 58 Fed. Appx. 116, 121-22 (6th Cir. 2003)(finding three or four incidents over several months where supervisor stared at, grinned at, and stalked the plaintiff insufficiently severe or pervasive to support a hostile work environment claim); *Downs v. Postmaster Gen.*, 31 Fed. Appx. 848, (6th Cir. 2002)(holding that district court properly granted summary

15

judgment with respect to the plaintiff's hostile work environment claim where the plaintiff merely alleged that a supervisor followed, stared at or stalked him on one occasion).  In any event, there is no genuine issue of material fact with regard to defendant's response to plaintiff's reports concerning this conduct.  Based on the evidence, the Court believes that no reasonable jury could conclude that defendant failed to adequately investigate and take prompt and appropriate remedial action when notified about Adams' conduct.

The March 24, 2004 incident when Adams allegedly exposed himself to plaintiff could, in comparison, be considered sufficiently severe to constitute sexual harassment. However this is the only incident plaintiff describes where Adams's conduct– as to plaintiff or any other employee– could be characterized as severe.  Upon being notified of Adams' conduct, defendant immediately suspended Adams, investigated the incident, and within a day of the incident, terminated Adams.  Pursuant to Michigan law, defendant cannot be held vicariously liable for Adams' inappropriate conduct if it took prompt and adequate remedial action.  *Radtke, supra*.  The Court therefore concludes that defendant is entitled to summary judgment with respect to plaintiff's hostile work environment claims.

### C.    Retaliation

Plaintiff alleges that defendant retaliated against her in violation of Elliott-Larsen and the Whistleblowers' Act.  In her first amended complaint, plaintiff specifically alleges that defendant's retaliated against her by "[g]iving [p]laintiff unwarranted discipline for allegedly making a false report of sexual harassment . . . [t]hreatening

16

[p]laintiff with unwarranted discipline . . . [and t]erminating [p]laintiff's employment.
*See* First Am. Compl. ¶ 29.  Plaintiff does not specifically identify the protected conduct
for which defendant retaliated against her in her first amended complaint; however, it
appears from her response to defendant's motion that her retaliation claims are based on
her reporting Adams' conduct to her supervisors and her reporting his March 24 conduct
to the police.  As plaintiff states in her response: "[she] was engaged in a protected
activity as defined by the Act when she reported the sexual harassment and assault she
had been subjected to by Mr. Adams.  The defendants informed [plaintiff[ that reporting
the assault/harassment to a third party would result in discipline."  *See* Resp. at 23

 To establish a prima facie case of retaliation under either statute, a plaintiff must
show: (1) that she engaged in a protected activity; (2) that this was known by the
defendant; (3) that the defendant took an employment action adverse to the plaintiff; and
(4) that there was a causal connection between the protected activity and the adverse
employment action.  *Garg v. Macomb County Cmty. Mental Health Services*, 472 Mich.
263, 273, 696 N.W.2d 646, 653 (2005)(citing *DeFlaviis v. Lord & Taylor*, 223 Mich.
App. 432, 436, 566 N.W.2d 661 (1997))(Elliott-Larsen); *West v. Gen. Motors Corp.*, 469
Mich. 177, 183-84, 665 N.W.2d 468, 471-72 (2003)(Whistleblowers' Act).[5]  There is no

---

 [5]In listing the elements of a plaintiff's prima facie case with respect to the
Whistleblowers' Protection Act, Michigan courts do not specifically state that the plaintiff
must show that the defendant was aware of the plaintiff's protected activity.  Presumably,
however, such a showing must be made to establish a causal connection between the
activity and the defendant's adverse action.

17

dispute that Plaintiff engaged in protected conduct when she reported Adams' behavior to her supervisor and the police.

In order to establish an adverse employment action, the plaintiff must show that the defendant acted "in a manner that is 'materially adverse in that it is more than a mere inconvenience or an alteration of job responsibilities' and 'there must be some objective basis for demonstrating that the change is adverse.'" *Schemansky*, 122 F. Supp. 2d at 781 (quoting *Wilcoxon v. Minnesota Mining & Mfg. Co.*, 235 Mich. App. 347, 597 N.W.2d 250 (1999)). For example, a materially adverse employment action may include "'termination of employment, a demotion evidenced by a decrease in salary, a less distinguished job title, a material loss of benefits, significant diminished material job responsibilities, or other indices that might be unique to a particular situation.'" *Wilcoxon*, 235 Mich. App. at 363, 597 N.W.2d 250 (quoting *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 885-86 (6th Cir. 1996)). In order to establish a causal connection between the plaintiff's protected activity and the employer's adverse employment action, the plaintiff must show that her participation in protected activity was a "significant factor" in the employer's action, not just that there was a causal link between the two. *Barrett v. Kirtland Cmty. Coll.*, 245 Mich. App. 306, 315, 628 N.W.2d 63, 70 (2001)(citing *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 929 (6th Cir. 1999)). Temporal proximity, standing alone, does not demonstrate a causal connection. *West*, 469 Mich. at 186, 665 N.W.2d at 472-73.

A presumption of retaliation arises once the plaintiff sufficiently establishes a

18

prima facie case.  Then "the defendant has the opportunity to articulate a legitimate,

nondiscriminatory reason for its employment decision in an effort to rebut the

presumption created by the plaintiff's prima facie case."[6]  *Hazle v. Ford Motor Co.*, 464

Mich. 456, 464, 628 N.W.2d 515, 521 (2001).  "In determining whether an employment

decision is a 'legitimate, nondiscriminatory' one . . . courts must not analyze the

'soundness' of that decision.  In other words, courts must not second guess whether the

employment decision was 'wise, shrewd, prudent, or competent.'"  *Id*. at 464 n.7, 628

N.W.2d at 521 n.7 (quoting *Town v. Mich. Bell Tel. Co.*, 455 Mich. 688, 704, 568 N.W.2d

64 (1997)).

     If the employer articulates a legitimate, nondiscriminatory reason for the adverse

employment action, "the plaintiff must demonstrate that the evidence in the case, when

---

[6]As the Michigan Supreme Court has explained with respect to the burden of
proof:

> While the burden of production shifts to the defendant at this
> stage . . . "[t]he nature of the burden that shifts to the
> defendant should be understood in light of the plaintiff's
> ultimate and intermediate burdens.  The ultimate burden of
> persuading the trier of fact . . . remains at all times with the
> plaintiff."
> . . .
> If the defendant does *not* articulate a legitimate,
> nondiscriminatory reason for its employment decision, the
> presumption created by the . . . prima facie case stands
> unrebutted.  However, this does not mean that the plaintiff is
> entitled to judgment as a matter of law.  Rather, in such a
> case, judgment in favor of the plaintiff would be appropriate
> only if the trier of fact believes the plaintiff's evidence.

*Hazle*, 464 Mich. at 464-65 n.8-9, 628 N.W.2d at 522 n.8-9 (emphasis in original).

19

construed in the plaintiff's favor, is 'sufficient to permit a reasonable trier of fact to conclude that [retaliation] was a motivating factor for the adverse action taken by the employer toward the plaintiff.'" *Id*. at 465, 628 N.W.2d at 522 (quoting *Lytle v. Malady*, 458 Mich. 153, 176, 579 N.W.2d 906 (1998)). In other words, to survive a motion for summary judgment filed by the defendant, the plaintiff must show the existence of a genuine issue of material fact as to whether the employer's proffered reason was a pretext for unlawful retaliation. *Id*. at 465-66 and n.10, 628 N.W.2d at 522. As the Michigan Supreme Court stated in *Hazle*, "[t]he inquiry at this final stage . . . is exactly the same as the ultimate factual inquiry made by the jury: whether consideration of a protected characteristic was a motivating factor, namely, whether it made a difference in the contested employment decision." *Id*. at 466, 628 N.W.2d at 522. ". . . [F]or purposes of a motion for summary [judgment] . . . a plaintiff need only create a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor in the employer's decision." *Id*.

With respect to plaintiff's prima facie case, defendant argues that it is entitled to summary judgment because plaintiff presents no evidence to establish that she suffered an adverse employment action. In her complaint, plaintiff asserts that she suffered an adverse employment action in that she was given unwarranted discipline for allegedly making a false report of sexual harassment, threatened with unwarranted discipline, and terminated. *See* Compl. ¶ 32. Except for her claim that she was terminated for reporting Adams' March 24 conduct to the police– which the Court will discuss later– the Court

20

finds that plaintiff cannot establish a prima facie case of retaliation based on other discipline or threats of discipline.

There is no evidence to support plaintiff's claim that her supervisor retaliated against her in a December 17, 2001 evaluation, due to plaintiff's memorandum concerning Adams' behavior on November 28, 2001.  Plaintiff asserts that she was criticized in the evaluation for violating defendant's dress code– specifically, wearing dark undergarments under light colored clothing– because she reported Adams' conduct. *See* Resp. Ex. 10.  Plaintiff's own notes, however, reflect that her supervisor Ruth Proffer approached her about this dress code violation on November 17, 2001– before she reported Adams' conduct.  *See* Ex. 14.  In her notes, plaintiff indicates that she told Proffer to put the complaint in writing.  *See id.*

But even if plaintiff was criticized about her dress after she reported Adams' conduct, plaintiff offers no evidence to suggest that this evaluation– or any other complaints, warnings, reprimands, or comments concerning her attire– adversely impacted her employment.  Thus these incidents do not constitute adverse employment actions as a matter of law.

Plaintiff also claims that she was written up on or about March 17, 2004, for allegedly making false accusations of sexual harassment.  *See* Resp. at 7 ¶ 30.  Plaintiff, however, was not reprimanded on March 17 in response to her accusations regarding Adams.  In fact, there is no evidence that plaintiff reported any incidents concerning Adams for at least a year prior to that date.  Plaintiff was written up on March 17 by her

21

supervisor Karen Fairchild after plaintiff filed a police report on March 12 stating that Fairchild physically assaulted her when Fairchild touched her shoulder.  *See* Mot. Ex. N & Ex. O.  In any event, plaintiff again offers no evidence to suggest that this action materially impacted her employment in an adverse way.

Plaintiff obviously suffered an adverse employment action *if* defendant terminated her.  Defendant, however, contends that it did not terminate plaintiff.  According to defendant, plaintiff resigned on March 25, 2004, when she called Plymouth Court and stated that she "would not be in anymore" and then failed to report to work or contact defendant for two or more days.  The Court finds a genuine issue of material fact as to whether plaintiff resigned or was terminated– particularly in light of the language in defendant's April 1, 2004, letter to plaintiff.  Specifically, plaintiff's supervisor Karen Fairchild writes in the letter that "[d]ue to the following circumstances, your *termination* became necessary."  *See* Mot. Ex. S (emphasis added).  As the reasons for its decision, Fairchild then lists plaintiff's March 25 phone call to Plymouth Court stating that she resigned her position, her failure to contact the facility or provide documentation from her physician regarding the results of her March 29 follow-up visit, and her failure to report to work or contact her supervisor on March 30, 31, and April 1, "which can only be viewed as no call/no shows."  *See id*.  Clearly if defendant believed plaintiff resigned on March 25, it would not need to list any other reason for her employment being terminated; moreover, plaintiff's failure to show up for work after she resigned would not be relevant

22

Plaintiff still must present evidence of a causal connection between her termination and her protected conduct.  While temporal proximity, alone, is insufficient, plaintiff testified that after she called the police on March 24 to report Adams' conduct, Jennifer Pressman told her that she "would be disciplined, leading up to, but not excluding termination for involving a third party."  *See* Mot. Ex. O at 159.  Within a week, plaintiff received defendant's termination letter.  While Pressman denies making this statement and states that plaintiff's report to the police played no role in any employment decisions, *see id*. Ex. D, under the applicable standard this Court must view the evidence in a light most favorable to plaintiff and assume the statement was made.  *See Liberty Lobby*, 477 U.S. at 255.

Defendant, however, presents a legitimate, nondiscriminatory reason for terminating plaintiff: violation of its "no call - no show" rule.  Pursuant to defendant's employee handbook, employees must not be absent two times without proper notification.  *See* Mot. Ex. T at 36-37.  The handbook provides that a violation of this rule is considered "severe" and "will result in suspension, subject to termination . . ."  *See id*. Defendant received a letter from O'Neill at Oakland Psychological Clinic dated March 24– a Wednesday– stating that plaintiff had been seen that day, recommending that "she not return to work this week," and advising that she would be seen again on March 29 (Monday) when a determination would be made about a return to work date.  *See id*. Ex. R.  On March 29 and 30, plaintiff failed to report to work, she failed to call defendant, and she failed to send defendant an updated letter from Oakland Psychological Clinic.

23

While defendant received a second letter from O'Neill on April 1, plaintiff already had failed to show for work on two days and to call or provide a letter to support her absence– technically a violation of defendant's "no show - no call" rule. As stated previously, it is not the Court's role to question whether an employer's legitimate, nondiscriminatory decision was wise, prudent, shrewd, or competent. *See Hazle, supra.* Thus defendant has set forth a legitimate, nondiscriminatory reason for terminating plaintiff.

Therefore to survive defendant's motion for summary judgment, plaintiff must demonstrate that the evidence in the case, when construed in her favor, is "sufficient to permit a reasonable trier of fact to conclude that [retaliation] was a motivating factor" for her termination. *See Hazle, supra.* The Court concludes that she has not done so. The only evidence plaintiff presents to support a retaliatory motive is Pressman's alleged comments on March 24. Plaintiff, however, has not even established that Pressman made the decision to terminate her. Moreover, evidence suggests that defendant reasonably believed plaintiff voluntarily resigned. Plaintiff called Plymouth Court on March 25 and stated that she "would not be in anymore" and she then failed to report to work or call work from that date until April 1. Notably, defendant phoned plaintiff's home during this period in order to assess her employment status but plaintiff refused to answer the phone or return defendant's calls. Based on this undisputed evidence, plaintiff cannot show that defendant's reasons for terminating her were a pretext for retaliation. The Court therefore holds that defendant is entitled to summary judgment with respect to plaintiff's retaliation claims.

24

### D.      Intentional Infliction of Emotional Distress

Plaintiff cannot maintain an intentional infliction of emotional distress claim against defendant based on Adams' conduct.  "An employer is liable only for the acts of its employee committed within the scope of his employment."  *McCalla v. Ellis*, 129 Mich. App. 452, 461, 341 N.W.2d 525, 528-29 (1983).  In *McCalla*, the court held that the plaintiff could not maintain an intentional infliction of emotional distress claim against her employer when she was raped by her supervisor. The cases plaintiff cites to argue that an employer will be held vicariously liable for the torts of its employees either do not hold as such or are inapplicable in this case.[7]   As Adams clearly was not acting within the scope of his employment when he exposed himself to plaintiff, defendant cannot be held vicariously liable for his conduct.

### IV.    Plaintiff's Request to Amend the Complaint

Plaintiff seeks permission to amend her complaint to add a negligent supervision, retention, and training claim *if* the Court determines that her pending claims fail.  *See* Resp. at 34. Pursuant to Federal Rule of Civil Procedure 15(a), leave to amend is freely

---

[7]For example, plaintiff cites *Champion v. Nationwide Security, Inc*., 450 Mich. 702, 545 N.W.2d 596 (1996), where the court held that the plaintiff's employer could be liable when the plaintiff was raped by her supervisor. *Champion*, however, was a quid pro quo harassment case and the Michigan Supreme Court consistently imposes strict liability on employers for quid pro quo harassment by supervisory personnel. *See supra*. The plaintiff did not allege intentional infliction of emotional distress or any other tort arising from her supervisor's conduct.  In *Cronk v. Chevrolet Local Union #659*, the court held that the defendant-union could be vicariously liable for its agent's assault on the plaintiff because there was evidence that the agent assaulted the plaintiff in order to further the union's business interests.  32 Mich. App. 394, 402, 189 N.W.2d 16 (1971).

granted where justice so requires. *See* FED. R. CIV. P. 15(a). The Supreme Court has instructed, however, that a motion to amend a complaint should be denied if the amendment is brought in bad faith or for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile. *Foman v. Davis*, 371 U.S. 178, 183, 83 S. Ct. 227, 230 (1962); *Leary v. Daeschner*, 349 F.3d 888, 905 (6th Cir. 2003). For a plaintiff's delay to support the denial of a motion to amend, "a district court must find 'at least some significant showing of prejudice to the opponent' . . . 'delay alone, regardless of its length is not enough to bar it [amendment] if the other party is not prejudiced.'" *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999)(quoting *Moore v. City of Paducah*, 790 F.2d 557, 560, 562 (6th Cir. 1986)).

Plaintiff originally filed her complaint in state court on May 6, 2004. She amended her complaint in order to add Health Care and Retirement Corporation of America as a defendant on January 11, 2005. Defendant subsequently removed plaintiff's amended complaint to this Court where, at a scheduling conference held on July 26, 2005, a scheduling order was entered setting a discovery deadline of September 30, 2005, and a dispositive motions deadline of October 15, 2005. Furthermore, the parties were informed at the scheduling conference that the pretrial in this case would be held on December 13, 2005, and that the trial would take place during the Court's January/February 2006 trial calendar. Pursuant to these deadlines, the parties conducted and completed discovery and defendant filed a motion for summary judgment on October 14, 2005. Plaintiff only sought leave to amend her complaint in her November 4 response

26

to defendant's motion.

The Court concludes that, at the very latest, plaintiff should have been aware of the basis of her negligent supervision, retention, and training claim when discovery ended in mid-October. Yet plaintiff did not seek leave to amend her complaint until a month and a half later, and then only in the final paragraph of her response to defendant's motion for summary judgment. Notably, plaintiff only seeks to amend her complaint if the Court determines that her remaining claims cannot survive summary judgment.

Based on the above, the Court concludes that plaintiff unreasonably delayed seeking to amend her complaint to add a new claim. There appears to be no justification for plaintiff's delay, nor does she propose one in her request to amend the complaint. Furthermore, the Court finds that defendant will suffer significant prejudice if it allows plaintiff to amend her complaint at this late stage in the litigation. Discovery will need to be reopened and defendant will have to prepare a new defense to this claim. The Court therefore concludes that plaintiff's request to amend the complaint should be denied.

## V.   Conclusion

In conclusion, the Court finds that plaintiff's sexual harassment claims fail as a matter of law. With respect to plaintiff's claim alleging quid pro quo harassment, her submission to or rejection of Adams' conduct or communications was not used as a factor in decisions affecting her employment. As to plaintiff's hostile work environment claim, the Court concludes that Adams' conduct– except for the incident on March 24– did not create an objectively hostile work environment. Assuming the March 24 incident alone

27

created a hostile work environment, the Court finds that defendant cannot be held vicariously liable for Adams' behavior because it adequately investigated plaintiff's complaints and took prompt and remedial action.  As to plaintiff's retaliation claims, the Court finds that if defendant in fact terminated plaintiff, it had a legitimate, nondiscriminatory reason for doing so.  Plaintiff cannot show that defendant's reason was a pretext for retaliation.  Finally, defendant cannot be held vicariously liable for Adams' conduct pursuant to an intentional infliction of emotional distress theory.

Due to plaintiff's extensive delay in seeking to add a negligent supervision, retention, and training claim– for which the Court finds no justification– and the prejudice defendant will suffer if the amendment is allowed, the Court denies plaintiff's request for leave to amend her complaint.

Accordingly,

**IT IS ORDERED**, that defendant's motion for summary judgment is **GRANTED**;

**IT IS FURTHER ORDERED**, that plaintiff's request to amend her complaint is **DENIED**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Herbert Sanders, Esq.
Karen Berkery, Esq.